Estate of Charles Laity, Deceased, Leta Laity, Executrix, and Leta Laity v. Commissioner.
Estate of Laity v. Commissioner
Docket No. 49146.
United States Tax Court
T.C. Memo 1955-176; 1955 Tax Ct. Memo LEXIS 148; 14 T.C.M. (CCH) 675; T.C.M. (RIA) 55176; June 30, 1955
*148 1. The accuracy of various items in respondent's net worth statement used in determining the income of Charles and Leta Laity for the years 1947 through 1949, determined and corrected. [1939 Code Sec. 293(a) - similar to 1954 Code Sec. 6653(b)] 2. No part of the deficiences for the years 1947 through 1949 was due to negligence or to the intentional disregard of rules and regulations. D. E. Fowler, Esq., Caswell Building, Milwaukee, Wis., for the petitioners. Paul Levin, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion The respondent determined a deficiency in income tax of Charles Laity and Leta Laity in each of the years 1947 through 1949 with additions thereto for negligence, as follows: Additions to Tax
Year
Deficiency
for Negligence
1947
$1,485.42
$74.27
1948
894.18
44.71
1949
387.32
19.37 Petitioners claimed an overpayment for each of the years in question. The primary question presented involves the accuracy of the net worth statement used by respondent to determine petitioners' income during the taxable years. The second issue is whether any part of the deficiencies so determined *149 are due to negligence. On brief, respondent concedes error with regard to a number of items included in, or omitted from, the net worth statement. Findings of Fact The petitioners are the Estate of Charles Laity, deceased, Leta Laity, Executrix, and Leta Laity, indivdually, (hereinafter referred to as petitioner). Charles Laity (hereinafter called decedent) and petitioner were, during the years involved, husband and wife, residing in Monticello Township, LaFayette County, Wisconsin. They filed joint income tax returns for such years with the collector of internal revenue for the district of Wisconsin. During the years here in dispute, decedent and petitioner operated a farm, predominately a dairy farm. They maintained their books of account on the accrual or inventory basis, which books were kept by petitioner. Petitioner and respondent agree that the original books so maintained were inaccurate, incomeplete and inadequate as a source from which to determine the correct amount of taxable income. In their income tax returns for the years 1947 through 1949, decedent and petitioner reported adjusted gross income as follows: Year
Amount
1947
$3,172.78
1948
3,726.80
1949
2,126.83
*150 Having found that the books and records maintained by decedent and petitioner were incomplete, respondent resorted to the socalled net worth method of determining income. In arriving at his determination by such method, respondent checked available records in the possession of the taxpayers, government records, bank records and third party records, and considered statements submitted to him by the taxpayers to establish their net worth for each of the taxable years. Respondent thus computed the income of decedent and petitioner, as follows: CORRECTED NET WORTH STATEMENT
ASSETS
12/31/46
12/31/47
12/31/48
12/31/49
Checking Acct. Shullsburg
$ 74.28
$ 709.03
[ 18.22)
$ 589.42
Bonds U.S.
157.87
Inventory
18,548.00
30,259.29
39,533.30
28,879.00
Machinery
12,190.00
15,138.00
20,045.00
23,371.00
Trucks and Autos
1,300.00
1,550.00
3,699.00
3,920.00
Farm #1
20,000.00
20,000.00
20,000.00
Farm #2
5,200.00
Improvements
836.00
1,693.00
Totals
$32,270.15
$67,656.32
$84,095.08
$83,652.42
LIABILITIES
Depreciation Reserve: Machinery
$ 2,385.24
$ 2,678.00
$ 3,655.05
$ 5,737.98
Autos and Trucks
824.17
1,024.58
401.22
710.45
Bldgs. and Improvements
320.00
650.26
1,232.84
Notes and Mortgages Payable: Farmers and Merchants Bank
Shullsburg, Wisconsin
200.00
4,030.00
7,050.00
4,350.00
Federal Land Bank
8,999.32
7,540.00
11,000.00
Mrs. Maude Kevern
1,000.00
5,350.00
5,350.00
5,350.00
M. B. Carr
3,270.35
7,479.35
O. G. Skewis
2,185.94
1,606.20
Accounts Payable
4,000.00
7,000.00
9,348.92
Totals
$ 4,409.41
$31,858.19
$40,732.08
$37,730.19
SUMMARY
Total Assets
$32,270.15
$67,656.32
$84,095.08
$83,652.42
Total Liabilities
4,409.41
31,858.19
40,732.08
37,730.19
Net Worth
$27,860.74
$35,798.13
$43,363.00
$45,922.23
27,860.74
35,798.13
43,363.00
Increase in Net Worth per year
$ 7,937.39
$ 7,564.87
$ 2,559.23
Plus: Estimated Personal and Living Expenses
$ 1,500.00
$ 1,500.00
$ 1,500.00
Federal Income Tax Paid
214.00
353.00
357.00
$ 9,651.39
$ 9,417.87
$ 4,416.23
Less: Capital Gain Adjustments
734.13
1,184.89
160.05
Net Taxable Income
$ 8,917.26
$ 8,232.98
$ 4,256.18
*151 Following respondent's investigation and computation of their income for the years involved by means of the so-called net worth method, decedent and petitioner made various corrections in their books and computed their income by use of such method as follows: NET WORTH STATEMENT
CHARLES AND LETA LAITY
ASSETS
AMOUNT
12/31/46
12/31/47
12/31/48
12/31/49
Cash in Lock Box
$ 3,714.13 $ $ $
Checking Account
74.28
709.03
(18.22)
589.42
Bonds - U.S.
175.87
Down Payment on Farm
1,500.00
Inventory
27,458.00
37,739.29
42,943.30
28,879.00
Machinery
12,190.00
15,138.00
20,045.00
23,371.00
Autos and Trucks
1,300.00
1,550.00
3,699.00
3,920.00
Farm No. 1
20,000.00
20,000.00
20,000.00
Farm No. 2
5,200.00
Improvements and Buildings
980.00
980.00
1,816.00
2,673.00
Totals
$47,392.28
$76,116.32
$88,485.08
$84,632.42
LIABILITIES
Depreciation Reserve: Machinery
$ 415.70
$ 1,680.64
$ 2,740.38
$ 4,823.32
Autos and Trucks
100.00
420.35
709.20
Buildings and Improvements
418.00
849.70
1,563.45
Notes and Mortgages Payable: Farms and Merchants Bank
200.00
4,030.00
7,050.00
4,350.00
Federal Land Bank
8,999.32
7,540.00
11,000.00
Mrs. Maude Kevern
1,000.00
5,900.00
5,900.00
5,350.00
M. B. Carr
3,270.35
5,490.90
C. G. Skewis
1,606.20
Ira Sieben
2,185.94
Accounts Payable
4,403.65
9,494.25
9,348.92
Accrued Taxes Payable: Real Estate
313.07
267.60
296.79
Personal Property
225.06
242.20
278.04
361.84
Totals
$ 1,840.76
$31,543.17
$41,636.42
$37,903.52
SUMMARY
Total Assets
$47,392.28
$76,116.32
$88,485.08
$84,632.42
Total Liabilities
1,840.76
31,543.17
41,636.42
37,903.52
Net Worth
$45,551.52
$44,573.15
$46,848.66
$46,728.90
45,551.52
44,573.15
46,848.66
Increase or Decrease in Net Worth
$ (978.37)
$ 2,275.51
$ (119.76)
Add: Personal Living Expense
626.56
762.91
619.20
Federal Income Tax Paid
214.00
353.00
357.00
$ (137.81)
$ 3,391.42
$ 856.44
Less: Capital Gains Adjustment (1/2 of net gains)
720.40
1,287.49
173.07
Taxable Income
$ (858.21)
$ 2,103.93
$ 683.37
*152 On August 5, 1946, decedent submitted a financial statement to the Farmers and Merchants Bank, Shullsburg, Wisconsin, which statement was signed and sworn to by him showing "Cash on Hand and in Bank" on that date in the amount of $800. At this time, decedent and petitioner had had a lock box for a number of years. No money was placed therein between December, 1946, and February 25, 1947, on or about which date decedent and petitioner purchased a farm (hereinafter referred to as Farm No. 1) from William C. and Foster O. Roberts. The settlement statement with respect to the purchase read in part as follows: $20,000.00
Purchase Price
1,500.00
Downpayment
$18,500.00
8,335.10
Roberts Mortgage
$10,164.90
274.90
Federal Land Bank Draft
(Balance of Loan Funds)
$ 9,890.00
5,890.00
Farmers and Merchants Bank
Check
$ 4,000.00
Paid in Cash
On December 27, 1946, decedent purchased a draft from the Farmers and Merchants Bank payable to William and Foster Roberts in the amount of $1,500. On February 25, 1947, a check was drawn on the same bank payable to W.C. and F. O. Roberts by petitioner who signed decedent's name thereto. This check was paid by the bank *153 on March 1, 1947. At the closing of the foregoing transaction on February 25, 1947, $4,000 in cash was paid William C. and Foster O. Roberts. On February 24, 1947, decedent cashed savings bonds having a face value of $225 for the amount of $175.87. During the year 1940, decedent and petitioner made a total of 13 loans from the Farmers and Merchants Bank above referred to, hereinafter called the bank, in amounts from $25 to $1,232.47. In 1941, they made a total of 15 loans from the bank ranging from $25 to $300. During 1942, decedent and petitioner made a total of 17 loans from the bank ranging in amount from $25 to $1,400. They made an aggregate of 15 loans therefrom ranging $25from to $2,100 in 1943. During 1944, such loans aggregated four and ranged from $50 to $600. In 1945, decedent and petitioner made eight loans from the bank ranging from $100 to $1,200. During the year 1946, they made 15 loans from the bank, which loans ranged from $100 to $2,500, and eight of which were made between August 5, 1946, and December 31, 1946. These eight loans totaled $3,900, of which $3,700 was repaid by December 31, 1946. Between November 1, 1946, and about December 15, 1946, decedent received *154 approximately $3,161.42 for milk products sold to Dunbarton Cheese Company. Decedent and petitioner were considered to be good farmers and familiar with livestock and the value thereof. At the end of each year, they, together with Helen Rhemsteadt, who prepared their income tax returns, valued the livestock on their farms and used such values in computing their income tax. On their joint income tax returns for the taxable years 1947 through 1949, decedent and petitioner reported opening farm inventory and closing farm inventory as follows: 1947
1948
1949
Opening Farm
Inventory
$18,548.00
$30,259.29
$39,533.30
Closing Farm
Inventory
30,259.29
39,533.30
28,879.00
Subsequent to respondent's investigation herein, decedent and petitioner, with the help of Marvin Godfrey, the supervisor for the LaFayette County Dairy Testing Association, revalued and amended the inventories of cows, heifers and calves as of December 31, 1946, 1947, and 1948, undertaking to reflect in their then opinion the reasonable value thereof. No revaluation of the cattle in the 1949 inventory was made, for, in the opinion of Godfrey and the Laitys, the original valuation was *155 correct. In his official capacity, Godfrey was familiar with and made butterfat and milk product tests for the petitioner during the years involved. The revaluation of the foregoing inventory was based upon a consideration of the herd's butterfat and milk production records; its salvage value on the beek market; the market value of milk; and to some extent, all their own experience in buying and selling dairy cattle. Each item of inventory was revalued as follows: 12-31-46
12-31-47
12-31-48
Cows $200 $200 $175
Heifers
150
150
130
Calves
75
75
65
The number of cows, heifers and calves in the LaFayette Dairy herd, as shown in the income tax returns for the years involved, were as follows: 12-31-46
12-31-47
12-31-48
12-31-49
Cows
57
63
74
83
Heifers
28
30
26
36
Calves
20
23
24
24
The amounts for improvements and buildings shown above in the net worth statement prepared by the Laitys refer to improvements made by them on a rented farm for which they have never had a lease, and consisted of fences, land improvements, and trees and shrubbery. The depreciation reserve shown in the above net worth statement *156 of the Laitys is based upon a 10-year life for the properties involved, except for certain buildings on Farm No. 1 and Farm No. 2, in which cases a useful life of 25 years was used. We find as an ultimate fact that no part of the deficiencies herein was due to negligence, or intentional disregard of respondent's rules and regulations. Opinion VAN FOSSAN: Judge: Petitioners have admitted that the books and records maintained by the Laitys during the years involved were incomplete and erroneous and have abandoned their attack on the propriety of respondent's action in resorting to the so-called net worth method of determining income. They now dispute the accuracy of the net worth statement prepared by respondent set out above in our findings and have prepared their own net worth statement. In this connection, respondent, at the outset concedes that the value of the "Bonds U.S." appearing on his net worth statement should be $175.87 at December 31, 1946, in lieu of the amount shown. In addition, respondent admits that there should be added to the assets shown thereon as at December 31, 1946, the amount of $1,500, representing the down payment made on Farm No. 1. Further, respondent *157 also concedes the addition to liabilities shown thereon, the following: 12/31/46
12/31/47
12/31/48
12/31/49
Accrued Taxes Payable: Real estate
$313.07
$267.60
$396.79
Personal Property
$225.06
242.20
278.04
361.84
The first item in dispute involves petitioners' contention that, as shown on the net worth statement prepared by the Laitys, respondent's statement errs by not reflecting in assets as at December 31, 1946, the sum of $3,714.13, representing cash on hand and kept in a safe deposit box. To rebut the argument thus advanced, respondent points to the financial statements subscribed and sworn to by decedent on August 5, 1946, wherein cash on hand and in the bank is listed as $800, and maintains that, in view of the numerous loans made from and repaid to banks by the Laitys during the period from such date to December 31, 1946, it is unrealistic to suppose that they, in fact, did accumulate the amount in question during such period. As pointed out by respondent, there is no reason to disbelieve the sworn statement of decedent, and, when this fact is viewed, together with the evidence showing the number of loans made and repaid by *158 the Laitys between the date the statement was rendered and the end of 1946, such evidence is far from helpful to petitioners' contention. It does not necessarily follow, however, that all of petitioner's sworn testimony should be disregarded. Some measure of credence is linked thereto by the facts showing the receipt of over $3,000 by the Laitys in November and part of December, 1946, for milk products alone and by the common knowledge that, in the northern United States, the bulk of farm income is received in the fall of the year. Moreover, the $4,000 in cash which we have found was paid by petitioner and decedent in February, 1947, at the closing of the purchase by them of Farm No. 1 would necessarily have been derived from some source and there is no evidence that such amount was borrowed. Having considered and weighed all of the evidence bearing upon the point and the inferences properly to be drawn therefrom, we have concluded that petitioner and decedent had on hand at the end of the year 1946 the amount of cash ($3,714.13) claimed, which cash was not properly reflected in respondent's net worth statement. Accordingly, we hold that respondent erred with respect to this item. *159 The next question involves the correct value to be ascribed to the Laitys' inventory of cows, heifers and calves as at December 31, 1946, 1947 and 1948. In computing the net worth statement upon which his determination of the deficiency here in dispute is based, respondent used the same values given to such inventory by decedent and petitioner at the end of each of the years in question and used by them in their tax returns. Petitioners insist, however, that such values are erroneous and that respondent's use thereof, after his determination with respect to the inaccuracy and incompleteness of the books maintained by the Laitys and his resorting to the net worth method, was arbitrary and unreasonable. We do not agree. With respect to the latter, - the inventory values used by respondent in his net worth statement were used by the Laitys in preparing their income tax returns, amendments of which have never been filed. Thus, these values, at least, constitute admissions by the Laitys and were available for respondent's use in making his determination. This being true, petitioners are bound by them until they offer credible evidence to the contrary. Cf. United States v. Hornstein, 176 Fed. (2d) 217. *160 To this end, petitioners presented evidence tending to show that the three most important factors to be considered in evaluating a dairy herd are the butterfat and milk production records thereof; the price received for milk as at the evaluation date; and the salvage value of dairy cattle on the beef market, of which factors the first two are the most important. However, there is no showing that these factors did not, in fact, play a full part in the Laitys' original appraisals of the herd. Decedent and petitioner were good farmers, well versed in animal husbandry and familiar with the value and the valuation of dairy cattle, and the values arrived at by them at the end of each year represented their mature judgment with regard thereto. Thus, absent evidence clearly showing otherwise, there is no good reason to suppose the Laitys' later judgment in revaluing the herd in retrospect, even when aided by that of Godfrey, was more nearly correct. Nor does the bald statement of petitioner to the effect that taxpayers were in error and the values used on their returns were understated, albeit corroborated by Godfrey's equally bald statement, establish that the original appraisals were erroneous *161 and that the later appraisal was correct. Particularly is this true when it is noted that at the time of the revaluation, this proceeding was in the offing and a tax advantage was to be gained by increased values. All of which is to say that, in our opinion, the evidence adduced by petitioners falls short of proving that the values used by them in their tax returns and by respondent in his net worth statement are in error. Respondent is sustained as to this item. Petitioners next seek to increase the amounts shown on respondent's net worth statement, as representing improvements, by the sum of $980 for each of the years 1946 through 1949. The improvements referred to include fences, land improvements, and trees and shrubbery put in by the Laitys on a farm which they rented and for which they had no lease. Moreover, there appears to be no actual conflict as to the cost and useful lives of such improvements and expenditures. The revenue agent responsible for respondent's net worth statement testified that he knew of the improvements in question but explained that they were not reflected on the net worth statement because they were put on rented property, for which there was no *162 lease, and that in such event the cost of improvements should have been written off in the year the expense was incurred. It is a well settled proposition of law that where a tenant makes improvements on property rented for an indefinite period on a month to month basis, or under a tenancy at will, such an expenditure is to be capitalized rather than deducted as an expense in the year of expenditure and depreciation is to be allowed on the basis of the estimated life of the improvement as though the tenant were the owner of the improved property. Ehrlich v. Commissioner, 198 Fed. (2d) 158, affirming memorandum opinion of this Court [10 TCM 744,]; George H. Bowman Co., 7 B.T.A. 399. In the latter case we said, in part: "* * * The duration of petitioner's tenancy of the building was indefinite and indeterminable. It occupied the premises at the will of the lessor and until it appears that petitioner's tenancy will end at some definite time, it is entitled to a deduction in the taxable year of no more than a reasonable allowance for the exhaustion of the cost of improvements over the useful life thereof. If petitioner's tenure extends over *163 the period of the useful life of the improvements it will have recovered its cost through the annual allowance for exhaustion; if the tenure should for any reason terminate prior to the useful life of the improvements petitioner will then be entitled to a deduction from gross income of the unextinguished cost of such improvements. In either event petitioner will have obtained the deduction to which, under the statute, it is entitled. * * *" The foregoing principles are applicable here. Accordingly, respondent's determination will be so adjusted as to reflect in each year the additional capital improvements involved. The next issue involves the propriety of the amounts shown on respondent's net worth statement for depreciation reserve on machinery, autos and trucks, and buildings and improvements. It is petitioners' contention as to this item that respondent's computation of such depreciation reserve should reflect only the actual amount of depreciation allowed the Laitys on their 1946 income tax return and those filed for years prior thereto. But, the legal principle is firmly settled that depreciation reserves are to be set up on the basis of the amount of depreciation allowed *164 or allowable, whichever is greater. Virginian Hotel Corporation of Lynchburg v. Helvering, 319 U.S. 523, rehearing denied 320 U.S. 810. In the latter case, the Supreme Court said in part: "A reasonable allowance for depreciation is one of several items which Congress has declared shall be 'allowed' as a deduction in computing net income. Int. Rev. Code § 23(a)(1), 26 U.S.C.A. Int. Rev. Code, § 23(a)(1). The basis upon which depreciation is to be 'allowed' is the cost of the property with proper adjustments for depreciation 'to the extent allowed (but not less than the amount allowable) under this Act or prior income tax laws.' That provision makes plain that the depreciation basis is reduced by the amount 'allowable' each year whether or not it is claimed. Fidelity-Philadelphia Trust Co. v. Commissioner, 3 Cir., 47 Fed. (2d) 36. Moreover the basis must be reduced by that amount even though no tax benefit results from the use or depreciation as a deduction. Wear and tear do not wait on net income. Nor can depreciation be accumulated and held for use in that year in which it will bring the taxpayer *165 the most tax benefit. Congress has elected to make the year the unit of taxation. Burnet v. Sanford & Brooks Co., 282 U.S. 359, 51 S. Ct. 150, 75 L. Ed. 383. Thus the amount 'allowable' must be taken each year. United States v. Ludey, 274 U.S. 295, 304, 47 S. Ct. 608, 611, 71 L. Ed. 1054." Respondent did not err in his computation of the depreciation reserve for machinery and autos and trucks. However, since we have heretofore held that respondent's net worth statement will be adjusted in each year to take into account additional improvements costing $980, his computation of the depreciation reserve will be correspondingly adjusted to reflect in each year the depreciation properly allowable on such improvements. Petitioners also contest the accuracy of respondent's net worth statement with respect to the amounts included thereon for mortgages and notes payable as at the end of each of the years 1946 through 1949. In this connection, petitioners urge that the amount of $2,185.94 shown as payable to C. G. Skewis as at December 31, 1947, should have been shown as owing to Ira Sieben. Although this error, if such it be, has no effect on the ultimate computation *166 of the Laitys' income for such year, the necessary adjustment will be effected in the Rule 50 recomputation. Petitioners further insist that in lieu of the accounts shown on respondent's net worth statement as payable to Maude Kevern as at December 31, 1947, and 1948, and to M. B. Carr on December 31, 1948, the correct amounts owing these parties should be shown as $5,900 and $5,490.90, respectively. Petitioner's position is supported by their own net worth statement appearing in our findings and by the testimony of petitioner as to the correctness of such amounts. While there is evidence in the record that respondent obtained the amount used by him as payable to Maude Kevern through an interview with her, respondent has not offered her testimony to contradict the testimony of petitioner, which he would have us reject. No attempt was made to cross-examine petitioner on this point or otherwise to contradict her previous testimony. On this item we hold for petitioners. Next the petitioners maintain that respondent erred in his computation of accounts payable at December 31, 1947 and 1948. As to this item, there is a complete failure of satisfactory proof and respondent is, therefore, *167 sustained. Nor have petitioners produced satisfactory evidence to show error in respondent's computation of personal living expenses of the Laitys for the years involved. In this respect, petitioners have offered a summary schedule purporting to show such expenses as taken from the original records, various pages of which were received in evidence. It has been demonstrated, however, that such summary does not include a number of items properly includible as living expenses. Respondent's determination as to this item is, therefore, affirmed. The next point of controversy pertains to respondent's determination of capital gains realized by the Laitys in the years involved. Petitioners contend that respondent has overstated such gains for the year 1947 and understated them for 1948 and 1949. To support the arguments so advanced, petitioners rely entirely upon a schedule purportedly showing such gains and losses for the years in question, which schedule was, according to petitioner, prepared from her original books and records and/or from those of the merchants from whom the various articles appearing thereon were purchased. Bearing in mind the admitted inaccuracy of petitioners' *168 original books, this evidence falls short of the degree of proof necessary to show error in respondent's determination. Accordingly, respondent's determination is sustained as to this item. There remains in controversy respondent's imposition of the so-called negligence penalty under section 293(a) of the Internal Revenue Code of 1939. [1]
Respondent argues that the books and records of the Laitys were kept in such a haphazard fashion as to justify his action. We do not agree. Although the petitioners admit, and we have found as a fact, that the books and records maintained by the Laitys were incorrect, incomplete, and inadequate as a source from which to determine their gross income, such a finding is insufficient to justify the imposition of the penalty here sought to be imposed. See Bennett v. Commissioner, 139 Fed. (2d) 961, *169 wherein the Court of Appeals, for the Eighth Circuit said, in part, as follows: "Under the statute the imposition of the penalty is dependent upon a finding that some part of the deficiency is due (1) to negligence or (2) to intentional disregard of rules and regulations. A finding that the return is incorrect, or that the taxpayer did not keep proper or complete books of account, or that his calculations are confusing is not enough. Little v. Helvering, 8 Cir., 75 Fed. (2d) 436, 439; Plunkett v. Commissioner, 1 Cir., 118 Fed. (2d) 644, 650; Board v. Commissioner, 6 Cir., 51 Fed. (2d) 73, 76; Bothwell v. Commissioner, 10 Cir., 77 Fed. (2d) 35, 38." The foregoing rationale is particularly apposite here. See also Regulations 111, Section 29.54-1, wherein farmers are specifically excluded from the requirement of maintaining permanent books and records. True, such exclusion does not excuse a farmer from his obligation to maintain sufficient records to enable him to compute and report his true income. But, absent corroborative evidence, his failure to do so is insufficient reason to impose the negligence penalty. Respondent's action *170 is disapproved. Decision will be entered under Rule 50. Footnotes
1. SEC. 293. ADDITIONS TO THE TAX IN CASE OF DEFICIENCY. (a) Negligence. - If any part of any deficiency is due to negligence, or intentional disregard of rules and regulations but without intent to defraud, 5 per centum of the total amount of the deficiency (in addition to such deficiency) shall be assessed, collected, and paid in the same manner as if it were a deficiency, * * *.↩